90 F.3d 1442
 Fed. Sec. L. Rep. P 99,280, 96 Cal. Daily Op. Serv. 5449,
96 Daily Journal D.A.R. 8891
DCD PROGRAMS, LTD.; JKB Alpha Programs, Ltd.; Technimatics
Five, Ltd.; Lord Hill Investors; Pack
Programmers; Uxbridge Management;
Integrated Commodity Systems,
Ltd., Plaintiffs-Appellants,
v.
Michael W. LEIGHTON, Defendant,
and
Jacob Y. Terner, Defendant-Appellee.
 No. 94-55776.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided July 24, 1996.
 
 Rick M. Stein, Palm Springs, California, for plaintiffs-appellants.
 James H. Lehr, Beverly Hills, California, for defendant-appellee.
 Appeal from the United States District Court for the Central District of California, Richard A. Gadbois, Jr., District Judge, Presiding. D.C. No. CV-85-01040-RG.
 Before: POOLE and O'SCANNLAIN, Circuit Judges; MARQUEZ,* District Judge.
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 May investors who purchased limited partnership interests in certain "tax shelters" recover as damages, in a federal securities fraud suit, back taxes and interest paid to the Internal Revenue Service?
 
 
 2
 * This complex and seemingly interminable securities fraud action was initially filed in 1985.[1] The plaintiffs consist primarily of two groups of California limited partnerships. The partnerships in the first group (the "1982 R & D Partnerships")[2] were allegedly established in 1982 by the defendants to research and to develop state-of-the-art technical trading systems for use in the commodity futures trading market. The second set of partnerships (the "1983 CTA Partnerships")[3] were also allegedly established by the defendants and were designed to serve as commodity trading advisors for licensees of the programs to be developed by the 1982 R & D Partnerships.
 
 
 3
 The plaintiffs' complaint alleged that the defendants sold certain investment contracts to the partnerships in derogation of the registration and anti-fraud provisions of the Securities Act of 1933, 15 U.S.C. § 77a et seq., section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. The complaint also alleged various violations of state law and of 18 U.S.C. § 1962(c), a section of the Racketeer Influenced and Corrupt Organizations Act ("RICO").
 
 
 4
 During the course of the litigation, the plaintiffs settled with two of the defendants (not including the present appellee, Dr. Jacob Y. Terner) for a total of $1,360,000. In addition, the district court also entered default judgments against a number of the other defendants (not including Terner) in the amount of $6,845,976 (representing $2,281,992 trebled under RICO).[4]
 
 
 5
 According to the plaintiffs' appellate brief, the defendants who sold the investment contracts to the partnerships also sold limited partnership interests in those partnerships to the individual partners. The defendants allegedly marketed these partnership interests as "tax shelters," telling the partners that because the partnerships would be highly leveraged and would incur significant research and development ("R & D") expenses, the partners would be entitled to substantial federal tax deductions from ordinary income under then-existing federal tax law. However, none of the R & D expenditures were made, and the Internal Revenue Service ("IRS") subsequently disallowed the deductions. As a result, in July 1991, partners of two of the 1982 R & D Partnerships[5] were forced to pay $1,385,669 to the IRS in settlement of back taxes and interest. (No penalties were assessed by the IRS.) In addition, the partners spent $70,000 for the services of a certified public accountant ("CPA") who negotiated their settlement with the IRS.
 
 
 6
 While it is not entirely clear from the extremely limited factual sections of the parties' briefs, it appears that during the course of the proceedings the plaintiff partnerships claimed that they were entitled to recover, as part of their damages, the taxes and interest paid by the individual partners to the IRS, as well as the funds paid to the CPA.[6] On April 26, 1994, the district court entered a final judgment which rejected this claim and ordered that the plaintiffs "take nothing" from Terner and defendant Richard Dougherty. The court noted that in an earlier 1993 order, it had held that "the payments to the IRS by the individual partners" and "the payments for CPA representation of the 1982 partnerships before the IRS are not potentially recoverable damages against defendant Dougherty in this litigation." In that earlier order, the court also noted that the amount the plaintiffs had received in settlement to date ($1,360,000) exceeded the partners' total capital investments in the partnerships ($1,062,796, representing $656,615 in initial capital outlays plus $406,181 in interest). Based on these calculations, the court held that the "plaintiffs have recovered by way of settlement all potential damages they could recover" from Dougherty. In its April 1994 order, the court stated that these conclusions applied equally well to Terner, and thus ordered that the plaintiffs "take nothing" from either defendant.
 
 
 7
 The plaintiffs timely appealed the court's order.[7] In this appeal, they argue that the district court's ruling was based on a finding that the payments of back taxes and interest to the IRS (and the payments to the CPA) are not potentially recoverable damages under sections 10(b) and 28(a) of the Exchange Act, and that this ruling was in error.[8]
 
 II
 
 8
 In analyzing the appellants' damages claims, we necessarily begin with Section 28(a) of the Exchange Act, 15 U.S.C. § 78bb(a). That provision states in relevant part that:
 
 
 9
 The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.
 
 
 10
 15 U.S.C. § 78bb(a) (emphasis added).
 
 
 11
 In Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) the Supreme Court "clearly interpreted § 28(a) as governing the measure of damages that are permissible under § 10(b)." Randall v. Loftsgaarden, 478 U.S. 647, 663, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986). However, "[i]n enacting § 28(a) Congress did not specify what was meant by 'actual damages.' " Id. at 662, 106 S.Ct. at 3152. In addition, neither section 10(b) nor Rule 10b-5 specifies an appropriate measure of damages, leading at least one observer to note that "[t]he question of damages under Rule 10b-5 is extremely open-ended." J. Cox et al., Securities Regulation: Cases and Materials 810 (1991); see also L. Loss & J. Seligman, Fundamentals of Securities Regulation 1060 (3d ed. 1995) ("Section 10(b) and Rule 10b-5 specify no damage or rescission standards, prompting the courts to take an ad hoc approach that often uses the common law out-of-pocket measure as an initial reference point and allows appellate courts to exercise the discretion traditionally left to the trial courts in finding damages appropriate to the facts of the case.") (citation, internal quotations omitted).
 
 
 12
 In Affiliated Ute, the Supreme Court suggested that the proper measure of damages under section 28(a) is ordinarily
 
 
 13
 the difference between the fair value of all that the ... seller received and the fair value of what he would have received had there been no fraudulent conduct ... except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.
 
 
 14
 Affiliated Ute, 406 U.S. at 155, 92 S.Ct. at 1473 (citations omitted). The Court has since suggested that Affiliated Ute's tort-based "out-of-pocket" measure is generally the appropriate measure of damages to be applied in cases arising under sections 10(b) and 28(a). See Randall, 478 U.S. at 661-62, 106 S.Ct. at 3151-52; id. at 668, 106 S.Ct. at 3155-56 (Blackmun, J., concurring) ("Normally ... the proper measure of damages in a § 10(b) case is an investor's out-of-pocket loss...."). While also noting that the issue of whether rescissory damages may be recovered under section 10(b) is "an unsettled one," id. at 661, 106 S.Ct. at 3151-52, the Court noted that there is authority for allowing a section 10(b) plaintiff, at least in some circumstances, to elect either an out-of-pocket or rescissory measure of damages. Id. at 662, 106 S.Ct. at 3152 (citation omitted).
 
 
 15
 This court, following Randall and Affiliated Ute, has generally defined "actual damages" under section 28(a) by referring to either the out-of-pocket or the rescissory measure of damages, and has suggested that consequential damages may also be had in appropriate cases:
 
 
 16
 Under the general rule, a plaintiff may recover the difference between the value of the consideration paid and the value of the securities received, plus consequential damages that can be proven with reasonable certainty to have resulted from the fraud.... The trial judge has the discretion to apply a rescissionary remedy which entitles a plaintiff to a return of his consideration less any value received on the investment.... Thus, a plaintiff in an action under § 10(b) is generally limited to recovery of out-of-pocket losses or actual damages.
 
 
 17
 Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1413 (9th Cir.1987) (citing Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 621 (9th Cir.1981); Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976)) (other citations omitted) (emphasis added).
 
 
 18
 In this case, the plaintiffs argue that the back taxes and interest paid to the IRS, as well as the sums paid to the CPA, qualify either as out-of-pocket losses or consequential damages. In addition, they argue that the taxes paid qualify as benefit-of-the-bargain or expectancy damages, and they urge this court to hold that such damages are recoverable under sections 10(b) and 28(a). We address these claims in turn.
 
 
 19
 * We first address the plaintiffs' arguments concerning the back taxes paid to the IRS.
 
 
 20
 * The plaintiffs first argue that the back taxes are recoverable as out-of-pocket damages. The plaintiffs offer no authority in support of this argument, and we reject it.
 
 
 21
 As noted above, under the out-of-pocket standard a defrauded purchaser is entitled to recover the difference between the price he or she paid for a security and the actual value of that security at the time of the purchase, plus interest on the difference. See, e.g., Affiliated Ute, 406 U.S. at 155, 92 S.Ct. at 1473; Blackie, 524 F.2d at 908; Arrington, 651 F.2d at 621. This measure of damages is purely compensatory, and it focuses on the plaintiff's actual loss, rather than on his potential gain. See, e.g., Wool v. Tandem Computers Inc., 818 F.2d 1433, 1437 n. 2 (9th Cir.1987) ("The guiding philosophy of the out-of-pocket theory of damages, therefore, is to award not what the plaintiff might have gained, but what he has lost by being deceived into the purchase.") (citation, internal quotations omitted).
 
 
 22
 In arguing that the taxes paid by the partners to the IRS represent out-of-pocket "losses," the plaintiffs fundamentally mischaracterize the nature of those payments. If the partners had not purchased limited partnership interests in the first instance, they would still have had to pay the taxes in question, based on their overall income situation. The fact that they ultimately did so does not suggest that they suffered an out-of-pocket "loss" as a result of their investment; rather, it merely indicates that one anticipated benefit of their investment failed to materialize. The taxes paid can therefore properly be characterized only as benefit-of-the-bargain damages, not as out-of-pocket losses. See 2 T. Hazen, The Law of Securities Regulation § 13.7 at 115 (2d ed. 1990) ("Loss of expected tax benefits do not qualify as out-of-pocket loss and thus can be awarded only as expectation damages, which ... may not be appropriate in rule 10b-5 cases."); Stone v. Kirk, 8 F.3d 1079, 1092 (6th Cir.1993) ("The Stones are not entitled to recover as damages the taxes they had to pay on their 1981 and 1982 income. They did not expect to have to pay such taxes, to be sure, but expectancy damages--damages designed to give the plaintiff the benefit of his bargain--are simply not recoverable under the federal securities laws."); Freschi v. Grand Coal Venture, 767 F.2d 1041, 1051 (2d Cir.1985) ("The district court correctly held that a Rule 10b-5 plaintiff can be compensated only for actual damages, and that any award in compensation for hoped-for tax savings would be an impermissible award of damages arising from an expectation interest.") (citation omitted), cert. granted, judgment vacated and case remanded for reconsideration in light of Randall v. Loftsgaarden, 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731, opinion on remand, 800 F.2d 305 (2d Cir.), as amended, 806 F.2d 17 (2d Cir.1986).[9]
 
 
 23
 This is not to suggest, however, that the partners' anticipated but unrealized tax benefits are irrelevant to the calculation of out-of-pocket losses. As explained by Justice Blackmun in his concurring opinion in Randall v. Loftsgaarden, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), investors will often pay a higher price for a tax shelter investment than for a comparable investment which does not provide similar tax benefits. Justice Blackmun characterized the portion of the purchase price which is paid for the expected tax benefits as a "premium." He suggested that in cases where a Rule 10b-5 violation occurs with respect to the promised tax benefits, it may be appropriate to consider this premium when calculating out-of-pocket losses.
 
 Justice Blackmun explained that:
 
 24
 To ascertain out-of-pocket loss requires taking into account all the elements that go into the price of a tax shelter. That price will reflect both the value of the underlying asset ... and the value of the tax write-offs that the construction and operation of the underlying asset will generate.... An investor will pay more for a share of an underlying asset when ownership will provide not only income and capital appreciation but also tax benefits.
 
 
 25
 Id. at 668, 106 S.Ct. at 3155-56 (Blackmun, J., concurring) (citations omitted). In addition, Justice Blackmun noted that:
 
 
 26
 An investor who receives the promised tax benefits, but not the promised income stream or appreciation, of course has been injured. But this injury--the difference between the value of what he received and the value of what he was promised--is represented, not by the entire purchase price, but rather by that portion of the purchase price which went toward a high quality underlying asset when what was received was a lower quality asset. In other words, the investor received the benefit of this bargain with respect to that part of the purchase price which went toward buying the tax benefits. The proper measure of recovery in such a case is therefore the part of the purchase price attributable to payment for an asset that was never received.
 
 
 27
 Id. at 669, 106 S.Ct. at 3156 (Blackmun, J., concurring) (emphasis added). Justice Blackmun's reasoning is similar to that adopted by the Second Circuit in William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp., 744 F.2d 935, 940 & n. 5 (2d Cir.1984), cert. granted, judgment vacated and case remanded for reconsideration in light of Randall v. Loftsgaarden, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986), and we find it persuasive.[10] See also Sharp v. Coopers & Lybrand, 649 F.2d 175, 190-91 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).
 
 
 28
 Justice Blackmun's reasoning makes it clear that taxes paid to the IRS in settlement of liabilities stemming from the disallowance of tax deductions do not qualify as out-of-pocket damages. However, to the extent that a plaintiff can establish that a Rule 10b-5 violation occurred with respect to expected but unrealized tax benefits, any "premium" which the plaintiff paid in order to obtain those unrealized tax benefits would be relevant in calculating out-of-pocket damages. Cf. Randall, 478 U.S. at 670 n. 2, 106 S.Ct. at 3156 n. 2 (Blackmun, J., concurring); see also Ronald B. Lee, The Measure of Damages Under Section 10(b) and Rule 10b-5, 46 Md.L.Rev. 1266, 1286 (Summer 1987) ("Justice Blackmun argued that tax benefits represent part of the value that the plaintiffs bargained for in such a tax shelter limited partnership. Consequently, if a Rule 10b-5 violation occurred with respect to these tax benefits, then the value of the tax benefits should affect the determination of damages under an out-of-pocket measure.") (footnotes omitted).
 
 
 29
 However, in this case, the amount that the plaintiffs have already received in settlement from other defendants exceeds the total capital invested by the partners, plus interest on that capital. Accordingly, the partners have already necessarily recovered any "premium" which they may have paid for the unrealized tax benefits, and have thus completely recovered their out-of-pocket losses.[11]
 
 2
 
 30
 For similar reasons, we reject the plaintiffs' assertion that the taxes paid may be recovered as consequential damages. As noted above, Rule 10b-5 plaintiffs may recover consequential damages which "can be proven with reasonable certainty to have resulted from the fraud." Volk, 816 F.2d at 1413 (emphasis added). The partners' tax liabilities resulted from the ineluctable requirements of the Internal Revenue Code, rather than from any wrongful conduct on the part of the defendants. As such, the taxes cannot be recovered as consequential damages.
 
 3
 
 31
 Finally, the plaintiffs argue that the back taxes paid to the IRS may be recovered as benefit-of-the-bargain damages. Relying on a number of recent cases from other circuits, they urge this court to hold that benefit-of-the-bargain damages are available under Rule 10b-5, and that promised but unrealized tax benefits qualify as such damages.
 
 
 32
 The benefit-of-the-bargain measure of damages allows a plaintiff to recover "the difference between what the plaintiff expected he would receive, had the defendant's representations been true, and the amount [the plaintiff] actually received ...." Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1426 (9th Cir.1986) (emphasis in original); see also A. Jacobs, 5D Litigation and Practice Under Rule 10b-5 § 260.03[c][v] at 11-60 (2d ed. 1992) (benefit-of-the-bargain measure allows plaintiff to recover difference between (1) the value, as represented by the defendant, of the security the plaintiff bought or sold, and (2) the actual fair value of that security on the date of purchase or sale). It is true that a number of circuit courts have recently concluded that, in certain limited circumstances, benefit of the bargain damages may be had under sections 10(b) and 28(a). See, e.g., McMahan & Co. v. Wherehouse Entertainment, Inc., 65 F.3d 1044, 1049-50 (2d Cir.1995) (citing Osofsky v. Zipf, 645 F.2d 107 (2d Cir.1981)), cert. denied, --- U.S. ----, 116 S.Ct. 1678, 134 L.Ed.2d 781 (1996); Pelletier v. Stuart-James Co., Inc., 863 F.2d 1550, 1558 (11th Cir.1989). However, this court has never held that such damages are permissible under Rule 10b-5. In addition, neither Affiliated Ute nor Randall suggested that such damages may be recoverable under section 10(b); instead, in those cases the Court limited its list of permissible damages under that section to out-of-pocket losses, rescissionary damages, or restitutionary damages.[12]
 
 
 33
 In any event, we conclude that we need not decide whether benefit-of-the-bargain damages may ever be recovered under section 10(b), because, relying on Randall and our interpretation of Randall in Volk, we hold that back taxes paid to the IRS may not be recovered even as benefit-of-the-bargain damages.
 
 
 34
 We first review Randall. The plaintiffs in that case had purchased interests in a limited partnership which was organized by the defendant and marketed and sold as a tax shelter. The plaintiffs brought a securities fraud suit under both section 10(b) of the 1934 Act and section 12(2) of the 1933 Act.[13] After a jury found the defendants liable for fraud, the district court awarded a rescissionary remedy under section 12(2) and entered judgment for the plaintiffs in the amount of the consideration paid for their partnership units. The court rejected the defendants' contention that the plaintiffs' recovery should be offset by the tax benefits received by the plaintiffs as a result of their investments.
 
 
 35
 The court of appeals reversed, holding that the "actual damages" principle of section 28(a) required that any award under section 12(2) be reduced by an amount equal to any tax benefits received.[14] The Supreme Court in turn reversed the court of appeals, holding that section 28(a) does not require a rescissory remedy under either section 12(2) or section 10(b) to be reduced by the amount of tax benefits received by the plaintiff.
 
 
 36
 The first part of the Court's opinion addressed the plaintiffs' contention that the definition of "income received" in section 12(2) did not include tax benefits received pursuant to a tax shelter investment. The Court agreed with this argument, explaining that the tax deductions "have no value in themselves; the economic benefit to the investor--the true 'tax benefit'--arises because the investor may offset tax deductions against income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income." Randall 478 U.S. at 656-57, 106 S.Ct. at 3149-50 (emphasis added). The Court also rejected the defendant's argument that the tax benefits received "constitute[d] a return of, or a reduction in, consideration." Id. at 659-60, 106 S.Ct. at 3151 (internal quotations omitted).
 
 
 37
 In the second part of the Court's opinion, the Court considered "whether § 28(a) requires such an offset when a rescissory measure of damages is applied to a plaintiff's § 10(b) claim." The Court concluded that no such offset was required, explaining as follows:
 
 
 38
 Respondents essentially ask us to treat tax benefits as a separate asset that is acquired when a limited partner purchases a share in a tax shelter partnership. But the legal form of the transaction does not reflect this treatment. Petitioners purchased securities, thereby acquiring freely alienable rights to any income that accrued to them by virtue of their ownership. They did not, however, also acquire a separate, freely transferable bundle of tax losses that would have value apart from petitioners' status as partners. For obvious reasons, tax deductions and tax credits are not, in the absence of a statutory provision to the contrary, freely transferable from one person to another if wholly severed from the property or activity to which they relate.... Accordingly, we decline to treat these tax losses as so much property created by the promoters of the partnership.
 
 
 39
 Id. at 665-66, 106 S.Ct. at 3154 (emphasis added).
 
 
 40
 This court relied on Randall's rationales in Volk. In Volk, the district court had held that the appellants' securities fraud claims were barred by the statute of limitations. In doing so, the district court rejected the appellants' argument that their claims did not accrue, and that the statute of limitations was not triggered, until they sustained "out-of-pocket money damages" in 1982 in the form of disallowed tax deductions.
 
 
 41
 As is the case here, the appellants alleged on appeal that the appellees had marketed the limited partnership interests as tax shelters which would give rise to substantial tax deductions. Relying on this fact, the appellants argued that
 
 
 42
 [E]ven if their cause of action normally would accrue at the time of purchase, a tax shelter investment requires a different result. They contend that it was impossible for them to realize they had been injured until 1982 when their deductions were disallowed by the IRS. Coupled with this argument is the proposition that appellants' recoverable damages, had they prevailed, would include losses occasioned by adverse tax consequences sustained in 1982.
 
 
 43
 Volk, 816 F.2d at 1413 (emphasis added).
 
 
 44
 This court, relying on Randall, rejected this argument:
 
 
 45
 An investment which leads to a suit for fraud does not vest a prevailing purchaser with a different measure of damages solely because the investment was marketed as a tax shelter. Appellants, like all investors in tax shelters, sought the benefit of sizeable tax deductions to offset other taxable income, but they did not acquire any alienable rights to tax losses having value apart from either the securities themselves or their status as limited partners.
 
 
 46
 Id. at 1414 (citing Randall, supra ) (emphasis added). In addition, we stated that:
 
 
 47
 Contrary to appellants' arguments, the nature of the investment as a tax shelter and the damages recoverable for fraud in connection with such investments have no bearing on the commencement of the limitations period. The actual monetary loss sustained by appellants in 1982 by virtue of the IRS disallowance is not the type of injury recognized by securities law. Investors must bring their lawsuits when they should discover that they paid an inflated price for securities as a result of misleading statements or omissions. Whatever action the IRS ultimately takes does not affect defrauded investors' rights to damages. Appellants' damages were fully cognizable prior to the IRS decision.
 
 
 48
 Id. (emphasis added).
 
 
 49
 The plaintiffs here argue that this language is dictum, because Volk 's actual holding was that the plaintiffs' claims were barred by the statute of limitations. It is true that Volk is distinguishable on that ground. However, as Terner correctly notes, Volk did necessarily consider whether a "loss" stemming from the disallowance of tax deductions constitutes an "injury recognized by securities law." Id. Volk answered that question in the negative, and we are bound by our prior decision.
 
 
 50
 For the foregoing reasons, we reject the plaintiffs' contention that back taxes paid to the IRS as a result of disallowed deductions may be recovered as damages under section 10(b).
 
 B
 
 51
 We also reject the plaintiffs' argument that interest paid to the IRS may qualify as either out-of-pocket or consequential damages. The interest paid merely compensated the IRS for the partners' use of money to which they were not entitled. As a result, to the extent that the IRS charged a market rate of interest, the interest payments merely prevented the partners from retaining a windfall. See Stone v. Kirk, 8 F.3d 1079, 1093 (6th Cir.1993); see also Freschi, 767 F.2d at 1051:
 
 
 52
 Similarly, the trial court noted that the interest and penalties IRS assessed against the senior Freschi were not a consequential damage; rather, they were simply compensation to IRS for the use of money IRS would have had if the senior Freschi had not wrongly withheld it. The interest and penalties were not, the trial court correctly observed, really a damage suffered by the senior Freschi at all, but a return by him of what would otherwise be a windfall resulting from his opportunity to use money to which he was not entitled.[15]
 
 
 53
 For the foregoing reasons, we reject the plaintiffs' contention that the interest paid to the IRS may be recovered as damages under Rule 10b-5.
 
 C
 
 54
 Finally, the plaintiffs argue that the $70,000 paid to the CPA may be recovered as either out-of-pocket or consequential damages. The plaintiffs' argument that these sums constitute consequential damages may have merit. However, in light of our ruling that the back taxes and interest are not recoverable damages, we conclude that we need not decide this issue. The amount received in settlement by the plaintiffs ($1,360,000) exceeds, by an amount greater than $70,000, the full rescissory recovery to which the plaintiffs would be entitled ($1,062,796, representing the capital invested by the partners plus interest). Accordingly, the plaintiffs have, in effect, already recovered the fees paid to the CPA, and we need not decide if those fees would otherwise qualify as consequential damages.
 
 III
 
 55
 Because the partnerships have already recovered all the "actual damages" to which the partners may be entitled under section 28(a), they are not entitled to any additional recovery. Accordingly, we affirm the district court's order that the plaintiffs "take nothing" from Terner.[16]
 
 
 56
 AFFIRMED.
 
 
 
 *
 The Honorable Alfredo C. Marquez, Senior United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The case has already spawned a number of interlocutory rulings by this court. See DCD Programs, Ltd. v. Leighton, 833 F.2d 183 (9th Cir.1987) (holding that district court abused its discretion by denying plaintiffs' motion to file fourth amended complaint); DCD Programs, Ltd. v. Leighton, 846 F.2d 526 (9th Cir.1988) (suspending defendants' prior attorney for misstating record on appeal); DCD Programs, Ltd. v. Hill, Farrer & Burrill, 942 F.2d 791, 1991 WL 159472 (9th Cir. Aug.15, 1991) (unpublished memorandum disposition) (reversing district court's finding that contracts between corporations and plaintiff partnerships were not "investment contracts" for purposes of federal securities laws)
 
 
 [2]
 Technimatics Five, Ltd.; DCD Programs, Ltd.; Integrated Commodity Systems; and JKB Alpha Programs
 
 
 [3]
 Lord Hill Investors; Pack Programmers; and Uxbridge Management
 
 
 [4]
 The parties have not discussed this default judgment in their damage calculations, presumably because the plaintiffs have little or no chance of satisfying this judgment
 
 
 [5]
 DCD Programs and Integrated Commodity Systems
 
 
 [6]
 In light of the fact that the named plaintiffs in this case are the partnerships, not the individual partners, and in light of the fact that only the partners (as opposed to the partnerships) actually pay taxes and might arguably have been "damaged" as a result of the disallowance of the tax deductions, we have some doubt regarding whether the partnerships are the proper parties to seek recovery of the taxes and interest paid by the partners
 However, Terner has not directly challenged the partnerships' standing to seek recovery of these alleged damages on behalf of the partners. This court was faced with an arguably similar situation in Sycuan Band of Mission Indians v. Roache, 54 F.3d 535 (9th Cir.1994), cert. denied, --- U.S. ----, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995). In Sycuan Band, a tribe of Indians sought an injunction prohibiting the state of California from prosecuting individuals employed in gaming operations on reservations of the Mission Indians. After the district court granted the injunction, the State argued on appeal that the tribe lacked standing to enjoin the prosecution of third parties. Id. at 538. However, because the state had failed to raise this argument in the district court, this court concluded that the argument was waived "unless the defect in standing deprive[d] us of jurisdiction for lack of case or controversy." Id. (citing Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953) for the proposition that the "rule denying standing to raise another's rights is 'only a rule of practice' which may be dispensed with in appropriate cases.").
 In this case, as in Sycuan Band, we believe that the constitutional standing requirements outlined in Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61, 112 S.Ct. 2130, 2135-37, 119 L.Ed.2d 351 (1992) are satisfied. Because we have a viable case or controversy before us, and because Terner has not challenged the partnerships' standing to seek recovery on behalf of the partners, we proceed to the merits.
 
 
 [7]
 The plaintiffs initially appealed the order as to both Dougherty and Terner. However, they subsequently dropped their claims against Dougherty after the Supreme Court ruled in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) that § 10(b) does not provide a cause of action for aiding and abetting. The only remaining claims relevant to this appeal are those against Terner arising under § 10(b) and Rule 10b-5
 
 
 [8]
 We note that the district court's order is ambiguous, and that it does not explicitly mention § 28(a). However, Terner apparently agrees with the plaintiffs' assertion that the district court's order was based on an interpretation of § 28(a). Because this is a plausible reading of the order, we accept the parties' interpretation and address the statutory issue on the merits
 
 
 [9]
 Freschi was vacated by the Supreme Court and remanded for reconsideration in light of Randall; however, Randall did not affect this portion of Freschi, and we find the Second Circuit's reasoning on the point persuasive
 
 
 [10]
 Although Salcer was subsequently vacated by the Supreme Court for reconsideration in light of Randall, the majority opinion in Randall did not affect this portion of Salcer 's analysis. This fact was implicitly recognized by Justice Blackmun, whose concurring opinion in Randall cited and relied on Salcer
 
 
 [11]
 Although the plaintiffs do not argue that they are entitled to recovery of additional damages based on a rescissionary measure of damages, we note that the amounts already received by the plaintiffs also exceed a complete rescissionary recovery
 
 
 [12]
 Cf. 79A C.J.S. Securities Regulation § 282 at 313 (1995) ("It has been said that a buyer defrauded in violation of the securities laws is entitled to recover only the excess of what he paid over the value of what he got, not the difference between the value of what he got and what it was represented he would be getting.") (footnote, citation omitted); 2 T. Hazen, The Law of Securities Regulation 115 (2d ed. 1990) ("the better argument [appears to be that] rule 10b-5 is couched in fraud, and as such the remedy should be limited to the traditional fraud [out-of-pocket] remedy with state law still being available for expectation losses on appropriate facts")
 
 
 [13]
 Section 12(2) states that aggrieved plaintiffs may sue "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a) (emphasis added)
 
 
 [14]
 The Court of Appeals applied § 28(a)'s "actual damages" limit to both the § 10(b) claims and the § 12(2) claims, even though § 28(a) is part of the 1934 Act and does not expressly apply to actions brought under § 12(2) of the 1933 Act
 
 
 [15]
 As noted above, Freschi was vacated by the Supreme Court and remanded for reconsideration in light of Randall; however, Randall did not affect this portion of Freschi, and we find the Second Circuit's reasoning on the point persuasive
 
 
 [16]
 In light of our disposition of this case, we need not address the other issues raised by the parties